Plata v. Newsom, 21-1696 and 21-16816. There will be a minute while people get themselves situated here. Thank you, Counselor, we're back. And when I said welcome to the Ninth Circuit, I mean welcome to the Ninth Circuit. Judge Bresner is just saying it's so nice to have lawyers back in the courtroom again. We've been lonely and it's really great to see you all back here. And when you're ready, let me just one thing about housekeeping. You all, I got notes indicating that you've agreed to split your time. That's fine, but it is entirely up to you to keep track of your time because I'm going to be trying to listen to your words. And so that clock, we have a very helpful clerk who will set that clock individually for each of you. But when it goes to zero, you have to stop talking because that means that's your time. Okay? So everybody's got that? Okay. All right, we're ready to hear your argument when you are ready. Thank you, and may it please the Court, my name is Martha Ehlenbach and I am appearing for the State Defendants. And I can tell you right now it's hard to hear you.  So could you speak up just a little? Yes, thank you. I would like to cede five minutes of time to Counsel for Intervenors, CCPOA, and reserve three minutes for rebuttal. I will keep my own time. Good, okay. This Court should vacate the District Court's injunction mandating vaccination for all workers in California prisons because it was based on an erroneous and unprecedented finding of deliberate indifference. The State did not violate the Eighth Amendment because allowing inmates who have ready access to vaccines to encounter a masked, unvaccinated, regularly tested worker comports with societal standards. Can I stop you right at the outset? I think there's some confusion, or at least I have a question about the correct standard of review here. Because the briefing treats this as though this is injunctive relief without a winter analysis. My real question is, do you agree that this is an abusive discretion standard? No, Your Honor. What's your position? We are asking this Court to review the District Court's legal conclusions that the State's policies show deliberate indifference. And a review of legal conclusions is de novo. The facts in the record regarding the State's vaccination policies are undisputed. Regarding the fact the State has implemented a vaccinator test mandate for all prison workers and a targeted vaccination mandate for workers in medical settings. And the facts in the record regarding the other multilayered measures that are in the record. You've said several things. I'm just going to back up if I could. Because opposing counsel is going to jump up and say, wait a minute, is there a dispute or not about whether or not the virus represents a significant health risk? I think the State was perhaps inconsistent about that. Certainly the State acknowledges that COVID-19 presents a substantial risk. What the State contends was error in the District Court's finding was the fact that the District Court did not acknowledge the fact and the extent to which the State's own measures have substantially reduced that risk. The State has implemented a vaccinator test mandate. The State has provided vaccines to inmates. And by doing so, vaccines are the single most effective measure available for an inmate to reduce the risk of severe illness and death. Do you have any authority, getting back to my first question, and then I'll try to get out of your way, but do you have any authority regarding the standard of review in this particular situation where there's a receiver in place? I couldn't find one. I don't believe the standard of review changes because there is a receiver in place. Was the answer to my question no? No, Your Honor. I would point this Court to a more broad authority cited in our briefing regarding de novo review of legal conclusions. Thank you. But going specifically to your point regarding the receiver, the receiver's authority in this context is limited to prison medical care, whereas the Secretary and other prison officials have broader authority over prison operations as a whole, and they are best situated to evaluate any potential operational concerns with a mandate and to determine the appropriate scope of a mandate considering public policy, public health, and public safety. The Secretary, I think your point's well taken regarding the scope of duties, and it's very, very broad for the receiver, but it's health care is my summary of that. So your briefing talks about collective, your team's briefing talks about 700 correctional workers being eligible to retire. I think the district court decided that was speculative. What do we know about that? Well, that does go to the Prison Litigation Reform Act and to the intrusiveness of the district court's measures. Certainly if this court finds that the Eighth Amendment conclusions were incorrect, there's no need to address the Prison Litigation Reform Act. It doesn't just go to the Prison Litigation Reform Act. It also goes to the deliberate indifference finding if there's a weighing of what has to happen within a prison. But I'm not trying to split hairs. I'm just trying to get to the point of what do we know in the record about whether or not that was speculative? What do we know in the record about 700 workers is what percentage of the workers? Do we know anything more about that? I would like to make two points in response. First of all, to your point regarding deliberate indifference and deliberate disregard, the Prison Litigation Reform Act and the operational concerns are of very low relevance there because really what we're looking at is we're looking at the reasonableness of the measures that the state had implemented. The fact that the state had implemented vaccination programs, the number of other measures that it is undisputed will significantly mitigate the risk of harms to the inmate population. But to your point regarding correctional officers, I don't believe the district court specifically said that there was any dispute regarding the fact that there were 700 unvaccinated officers who could retire with full benefits. I'm asking a slightly different question, which is do we know anything in this record about what percentage does 700 represent? If they were to retire rather than get vaccinated, what kind of hit would that be in terms of the other obligations that the Secretary has to run a prison safely? Do we have anything along those lines? Yes, Your Honor. I do not have this precise percentage of what 700 correctional officers we represent. I believe that would be a relatively low percentage. We do have evidence in the record from Washington State showing that 4.5% of their correctional officer population did leave their positions after their mandate was put in place. And we have evidence in the record from somebody with significant expertise in prison operations establishing that if the California Department of Corrections were to lose a similar number of staff members, that that would cause a significant adverse impact on prison operations. So the operational concerns are real, and that was specifically Washington State.  Certainly, currently... Are you saying that the correctional officers have a veto power effectively over whether something is an Eighth Amendment violation or not? No, Your Honor, not at all. And certainly individual officers are free to choose to leave their positions at any point in time. But it is certainly within the executive's prerogative to consider any operational concerns and to weigh those concerns as a matter of public policy and public safety. But this is a really important point, because if I could chime in, the timeline strikes me as the state was moving along, in fact, in agreeing to an implementation plan, and then... What was the word that you used when the union became involved? A veto? Yes. Everything came to a screeching halt. And so the question is, and opposing counsel is going to argue this, as you know, in the briefing, how hard did the state push? What kind of record do we have to show whether or not the state had the ability to simply hire other workers who were being trained up anyway, to the extent some of these 700 folks did choose to retire? What do we know about that? With respect to other workers, Your Honor, there was evidence in the record that in the medical care context, there is an ability to hire contract workers. It is much easier in that context to hire other medical professionals, whereas there are no such contracts in place for correctional officers. There are fewer correctional cadets who can fill correctional officer positions who have graduated recently. And in part, that is due to the pandemic. But that doesn't change the fact that it is a confluence of events that have created these operational concerns. So, again, I'm just trying to... Do we have anything more specific than that, other than to know, I think, that we do from this record that it's a very large fleet of people. Some retire every year. There's a constant pipeline trying to retrain and recruit. But do we know anything more about the extent to which this system is vulnerable to these people retiring? We do know some of the numbers, Your Honor. I believe there were over 1,600 cadets who had graduated in 2018-2019, and that number was less than 400, at least as of the time of the briefing. So we have that. Do you know how many officers, for example, would routinely retire in a normal year? So what is the actual pipeline? How much does it require replacing in any other year? Do we know that? I believe there was some evidence cited that it was around 5%. But any percentage of officers who were lost due to a mandate would be in addition to that turnover rate. And it would also happen much more quickly, particularly given implementation deadlines, deadlines for officers to become vaccinated. So there are different questions here. We also know, again, that Omicron has changed the calculus, that vaccinated and unvaccinated individuals can still spread the virus. And I see I am running out of time here. I will, unless this Court has any questions, I would like to. Well, let me just check because we've taken up a lot of your time with questions. So do you have other questions at this point, Judge? I do, but I'm comfortable waiting until you come back. Thank you, Your Honor. Okay, that's fine then. Thank you. I may please the Court. Greg Adam for the California Correctional Peace Officers Association. I'm largely going to throw out my script because I do want to address the points, the questions you were asking about staffing. But just one point before I do. This is an unusual case, and in fact, CCPOA's role in it is quite unusual. We first got involved in 2007 where we actually supported the plaintiffs in their motion to create a three-judge panel. And we actually supported the plaintiffs all the way to the U.S. Supreme Court, including supporting the request for an inmate release order, supported it all the way there. Then we basically backed out of the case. But once COVID hit, we became involved informally, and the parties were gracious enough to allow us to do that. Judge Tiger welcomed us. And we intervened formally once a vaccine mandate was announced because clearly our members' rights were at issue. So unusual case, no veto. I don't know where this idea that we've got some kind of veto. So here's what happened. Again. It isn't a subtle point. That's how the record reads. I just want to be very up front so we can get your candid response because it does read as though the state was cooperating, cooperating, and then there was the announcement. You know, cooperating with formulating an implementation plan and that your constituency didn't want to go along. So what am I missing? As were we cooperating. And the record's also replete with examples of us working with public policy schools. All kinds of people would come up with ways to voluntarily encourage people. And our union's been out front. Our presidents were getting videos taken as public service announcements of themselves being vaccinated. But let me deal with this question of the 700. So there's about 25,000 frontline correctional officers in the system. 700, you can probably do the math, somewhere between 2% to 3% to 4%, which may not seem like a lot. The problem is that if they're all going to leave at once, normally we've got attrition rates over the course of a whole year where maybe you have that kind of number leaving and there's people on tap to replace them. When you suddenly lose that many people all at once, plus a percentage of people who may not be retirement eligible but may yet be unwilling to do the vaccination, you're going to get a hit all at once on a system that Ms. Gibson, who's the operations secretary in her declaration, explained is already terribly overstretched. And that has all kinds of impacts on programs and what have you. And the reason the 700, what it means is they could retire is they maybe weren't planning to retire but they're retirement eligible. And as soon as you're retirement eligible, you can start picking up your pension. You may have planned to work an extra five years for various reasons to increase your pension. But when faced with this situation, you may take advantage as a lot of peace officers are doing. If I could interrupt, I think your point's well taken, but I'm trying to tease this out. Does that mean that the district court, from your perspective, would have been okay if he had phased in the mandate rather than requiring it all at once? I think a one-size-fits-all was a mistake. I understand that, but if he were to do this again for the next wave, I'm trying to anticipate what would your objection be or would the system have the same vulnerability if it had been phased in over a period of several months? It depends on the circumstances. And I agree with counsel that circumstances with Omicron have completely changed things. And one of our concerns would be if the court's inclined to support the district court is you can't just pretend we're back in September of 2021. I guess what's confusing me is what is the relevance? I understand your client's interest here, but what is the relevance of this particular dispute to the legal question of whether the state has acted with deliberate indifference based on the particular measures it has already implemented? The state may have some reasons why it's chosen some of them, but at the end of the day, we're evaluating the measures it took, and I'm just not sure that this dispute about the 700 or phasing in is particularly relevant to that issue. Well, I think we get into the questions of the intrusiveness. Is this the least intrusive way that the district court could have tackled the problem? That's right. It may be relevant to that secondary question. I'm not sure it's relevant to the threshold question, though. Deliberate indifference being the threshold question. Well, deliberate indifference, again, we've made it clear. We think the state acted reasonably, right, by everything it did. In fact, the state was cutting edge. This isn't a question of deliberate indifference. The state's actually on the cutting edge compared to other correctional systems in terms of the actions that it took. Very hard to show deliberate indifference given everything the state did, including, let's bear in mind, a partial vaccine mandate that the state implemented. Our problem was with the one-size-fits-all, that at a time that it was implemented when 50% of the prisons had zero cases. That was our problem. Can I just speak to the veto, this perception that somehow we get involved and the state stops implementing? The state implemented a vaccine mandate despite our reservations. Again, we've supported voluntary vaccination. We've opposed the mandate because we can't afford to lose people. Public safety people are leaving in droves all over the place. We've got a safety responsibility. We can't just keep working our people to death here. I may have not been as clear as I could have been. My question was not specifically whether the union in this instance is a factual matter, exercised a veto over the state implementing the receiver's recommendation. Rather, it was more of a legal question, which is if the correctional officer's union would be upset by a requirement that they do X, is that part of the Eighth Amendment calculus? Is that a consideration in deciding whether or not the state is deliberately indifferent in either doing X or not doing X? It's not about people's feelings. It's about what the facts are and what the ramifications are and what the people who run our prisons, the experts, and the state's highest-ranking public health official, their viewpoint plus the people who run our prisons. Let's face it, the law is full of deference to people who run prisons because of the complexity of them, especially in a pandemic. We're second-guessing them from courtrooms. What we brought to the table, our union, was the practical experiences of the men and women up and down our state. Let me just ask. Let's say we knew for a fact that if the vaccine mandate went into effect for correctional officers, 700 of them would quit. Is that a factor in the Eighth Amendment calculus as to whether or not the state is deliberately indifferent in not imposing a vaccine mandate? It could be because you've got to look at what's the ramifications of that. Right, so that means that, yeah, your answer to my first question is yes. I think it applies to both prongs. Then the union effectively, as a matter of the Eighth Amendment, has a veto power over the deliberate indifference calculus because if too many correctional officers say, hey, if you make us do this, we're going to go, then something that could have been required by the Eighth Amendment is no longer required by the Eighth Amendment because of the ramifications for staffing. We've got 30,000 members. We've got a Big Ten. That's the language we used in the case, in the case management conferences. We've got to re-represent people. I'm not sure you're answering my question. I'm trying to. In all four corners. The fact that we may have 500, 700 people who have individual viewpoints for all kinds of individual reasons does not make the union vetoing the Eighth Amendment. I think we've got your answer, and you're significantly over time. Thank you for your argument. We'll hear from opposing counsel, please. Your Honor, we've agreed to divide up our 20 minutes evenly. However, my colleague has graciously said that if I'm in the middle of an answer or I haven't quite covered something, I can go over two or three minutes, and she'll defer to that. So I appreciate the Court's indulgence. Well, it's not my indulgence. It sounds like it's your colleague's. Go right ahead. May it please the Court, Your Honor, counsel. I want to focus on three points. The first, the standard of review. The district court here made very detailed factual findings based on an undisputed record. I think that's right. So how do we review this? Those factual findings are reviewed on a clear-air standard. Right, but they're uncontested. So my problem, right, is this unique circumstance with the receiver, and both of your briefs use this abusive discussion language as though this was injunctive relief. So it's two. On the Eighth Amendment, you've got the clear error on the factual findings, and then the question is, did the state knowingly use measures that it knew to be inadequate? That, we would submit, is a factual finding. So that the legal question under the Eighth Amendment becomes a factual finding, which on this record is undisputed, which is my second point, which is the second big point. Is it undisputed? Here, the receiver issued a 30-page, single-space report. In response, the state said, we agree with the public health findings in the receiver's reports. The state's own medical expert submitted a declaration in defense of its limited mandatory vaccination, and when it said that it's highly unlikely that any non-pharmaceutical measures would be effective, and the single most effective measure is a vaccination. I don't think this is contested. None of that is contested. So the standard under the PLRA is then abusive discretion. All right, so that's how the two standards come up, and essentially they merge very similarly to, is there a basis for the factual findings by the court? Okay, but even if we were to review all of this, really setting aside, I know I've been the one asking about the standard because I found an inconsistency in the briefing, but getting back to the threshold question that I think all of us have been probing, this is a very tough standard. Deliberate indifference is a very tough standard to show in this context, and the state has taken a lot of measures. So what's your best shot? So on that, I don't think it's a hard standard. I think it's actually quite straightforward, and it goes back to really my second point. Unlike the Freyhaut case, which the Ninth Circuit decided a majority decision a year or so ago, that case was very different because the court, the district court there, issued a very invasive order at the outset of the pandemic. While the science was literally changing daily, and there were no factual findings in the record as to what would or would not work, this case is entirely different. We have a year and a half of factual findings, of facts. The district court made findings. He found, based on those undisputed facts, that masking was not working, that the custody staff was not complying with that, that social distancing could not be complied with in the prison setting because of the close quarters, because of the requirement that people be in custody, that the testing twice a week wasn't working. Those facts are in the record. So now the question is, when the state has available to it a vaccination, which its own experts say would do the difference, make the difference, is it deliberate indifference not to impose it? How much of a difference? Did the district court or the receiver quantify how much more effective a vaccine mandate would be to curb the spread of COVID in prison than the measures that are currently in place? Well, I don't know if the district court quantified it. But what we do know... Wasn't that important? Well, that's a medical... I mean, the COVID-19 virus and the implications are changing daily. I mean, the newspaper today talks about a new virus coming out of China. So it's impossible to predict the impact. What we do know is that there were 50,000 infections, about half of the people in custody, at the time the district court issued its order. That the vaccination rate among the staff was around 50%, a little bit before that, even on one dose, far below that for the custody staff. And we do know that after there were vaccinations, there were 400 breakthrough infections. So that's a lot less than the 50,000 there were before. So that is a fact that's in the record. I'm sorry. Go ahead. I mean, it's just... Just in terms of a hypo. Let's say, one, there's a medical condition and one treatment is 78.1% effective and the second treatment is 78.2% effective. If there are reasons to go with the 78.1% effective remedy, that wouldn't be an Eighth Amendment violation because the marginal difference is not that much. So, yeah, vaccines would be more effective. But how much more effective? Would it save one? Would it cause one fewer case? Would it cause 100 fewer cases? Would it cause 10,000 fewer cases? Respectfully, I don't think the standard is whether it's 5% or 6% or 7% better. I think what the record, an undisputed record, says is that the measures that the state had implemented were not working. Compared to what? Compared to what? Compared to... Of course they were working. They just weren't working as good as well as vaccines. No, they were not working, Your Honor. They were not working. Are you measuring that, Counselor? Is your yardstick whether the virus was or was not getting into prison? Say that again, Your Honor. Is your yardstick whether the virus was or was not getting into prison? No, because you're not going to keep the virus out of prison entirely. So then when you say not working, what is your yardstick? It's not working in the sense that more than half of the inmates contracted the disease. 240 people died. People have died since the judge's order. Okay, but the vaccine was a game changer, right? Yes. So part of these numbers, as you said, this is a fluid and evolving kind of situation. But when we get to the place that we're talking about, which is after the vaccine became available and this mandate was implemented, why isn't it, getting back to Judge Finerman's question, why isn't it incumbent upon us to, when we look at this deliberate indifference standard, to weigh more than the optimal medical circumstance? There are other realities and demands for running a prison system. The Eighth Amendment does not require, I agree with you, Your Honor, the Eighth Amendment does not require the state to implement the best measure. I agree with that. But the Eighth Amendment prohibits the state from relying on measures that it knows does not work. And that is the situation. But that standard is almost no standard because we know that anybody who, even people who have fully vaccinated and boosted can get breakthrough. So that doesn't help us really. Maybe I'm not being clear. I'm not saying when I say it doesn't work, I'm not saying it has to eliminate all infections. It's not going to. We all know that for the last two years. But the rate of infection that was coming into the prison and spreading as a result of the staff, particularly the custody staff, not complying with the measures, social distancing not working, they weren't complying with the testing requirements, all of that's now in the record. That made it not working. Now, when I say not working, the infections were at a – the infection rate was at a level that society does not tolerate. I guess that is my answer to your question. And it's not – I don't think it's the proper test to say, well, it's got to be 5% better or 10% because you're never going to get that. But is the – Go ahead, please. Is the implication then of the argument that the Eighth Amendment is being violated essentially in every prison nationwide? No, it's not. And that goes back to my second point about the undisputed record. The uniqueness of this case is that the facts were undisputed. I can imagine a prison situation where they do a better job of policing masking, where they do a better job of policing testing, where they do a better job of policing social distancing, and the district court would not have a basis to issue the order that the district court issued here. So I don't think that a ruling here affirming Judge Tiger's order sets a precedent for other prisons. And I would encourage the court to write an opinion affirming that is, in fact, narrow and based on the facts in this case. So I don't think it creates that precedent. Did the implementation plan phase in the mandate, or was it going to all happen at once? The implementation, the order initially asked the state to confer with the medical experts and come up with an implementation plan. Candidly, the state then dragged its feet for weeks and weeks and weeks, and eventually the judge issued an order that it be mandated by a certain date. I don't recall the date, but it was some months in advance. And then there was a motion for a stay, and that was granted by the next order. My question is, did the implementation plan ever contemplate a gradual phase in? I think so, Your Honor, but I'll defer to my co-counsel on that. I think so, but I'm not positive. Okay. It seems the hardest part here for your side is that the state has undertaken a large number of different measures, and we could debate whether something would have been better, but the legal standard, I think, creates your biggest obstacle. Except, Your Honor, the law is clear that you look at what's currently available. You look at the measures they're taking now. They don't get a pass. The state doesn't get a pass because it tried to do the right thing with the available measures. We now know that those measures didn't work. There were too many. There were an unacceptable rate of infections, an unacceptable number of deaths, an unacceptable number of long-term illnesses as a result. And the other measures, for example, they've argued that we should have limited the mandate. If we're going to do a mandate, it should have been limited to the custody staff. That doesn't work because we know, again, it's undisputed, that the vector for bringing the infections into the institutions is all of the staff. They've argued that voluntary, and those people bring it in, and they pass it to the custody staff, who then pass it to the inmates. They've argued that voluntary vaccinations were effective. No, they weren't. We know that because the vaccination rates for the custody staff were below 50% at all of the institutions. Some of them were in the teens, shortly before the judge issued his order. Let me just see if I have other things I need to cover. The other thing I would say that's also undisputed is the harm here goes beyond the harm to the inmates who actually contract the infection. We also know that because of this, that has impeded the delivery of other health care services to the inmate. Again, an undisputed fact in the record. I guess I would say this, Your Honor. It seems to me, actually, on the other point I'll make, is you asked a question to my opposing counsel. The only thing that's on the record as to the effect on the institution is we know, there was in the record the compliance rate with the state's mandatory vaccination orders. At those two institutions, there was only like 2% and 5%. It was sky high, but that was a different cohort. Yeah, but those people were largely complying. That was before even the progressive discipline. And with respect to burden, I would bring the Court's attention to the declaration of Tamitha Foss, who's the Director of Correction Services, and it is R079, where she talks about the annual rate of attrition being 5% and that the state has procedures to accommodate the loss of staff. And, in fact, they're prepared for as much as a 10% rate. So the only evidence in the record, as opposed to the state's speculation, is that there was no significant impact. I will submit to my co-counsel, Your Honor. Thank you. I think you've got about eight minutes. Rita Lomeo on behalf of the plaintiff class. This Court should affirm the order limiting entry into the state prisons to workers who are vaccinated or have an established exemption. I think I'd like to take some of the arguments backwards that we've already heard today. One question was about the need to quantify the level of harm. I don't think the Supreme Court in 2011 required any such quantification of the amount of harm and the amount of reduction of harm that would be achieved through the remedies there. But I think it's really a point very well taken that Judge Finer is making. When we're looking at this standard, deliberate indifference, subjective and objective, and we know it's black letter that they don't have to do, you know, difference of medical opinion won't cut it for purposes of this analysis. So to say that the leaders are being deliberately indifferent to this other option seems to me to necessarily require that we consider how much better they could make it. I think that a different way of looking at it, instead of requiring hard facts that we don't have in sort of shifting, evolving landscape, is to look at is this a risk that society is willing to tolerate. And I think you don't have to look far to find out. What's the vulnerability for you? Because there's a whole lot of people out in society that we all encounter them, people who didn't wear masks, who did tolerate this risk. What do we do about that? I think you have to look at the context. And in society outside of prison, there's a CDPH order from August 5th, which says in certain settings that share certain features, we're not willing to accept the risk and we're going to require that all staff and all workers in that context be vaccinated. And the district court here found that those same features are present in the prison system. There's simply no difference except for the fact that one is outside of prison and one is within. But there are many states that don't have vaccine mandates and, in fact, that prohibit vaccine mandates by private employers or private entities. I understand that. And they're part of society, too, for better or for worse. Yes. I think the only difference that I can see is that this is a captive audience, a very vulnerable captive audience that doesn't get to make the choice. So I'm trying to figure out how to factor that in. But apart from that, I think opposing counsel's arguments are very well taken, that we've seen lots and lots of people who have tolerated this. Now, some of them have paid with their lives, arguably, because they have contracted this terrible disease. But in the prison system, the argument that this is a risk that society has not tolerated, I think is becoming increasingly difficult for you to make. I don't think it is that difficult. I think what you have to look at is the conditions that have been imposed on my clients. And one of the examples, sort of trying to make it sound similar to the outside world that the state gives, is to a grocery store. And a grocery store does not even begin to resemble a prison unless you took everyone in this courthouse and everyone watching online and went to the same grocery store and locked us in and locked the doors, locked the windows, rolled in bunk beds down the aisle, made us all sleep there with hundreds of other people maskless. Any time we wanted to move about, an officer, potentially vaccinated, potentially not, would pat us down, would shackle us, would escort us to where we needed to go. We would share the same toilets. We would share the same shower. And we wouldn't do that for 30 minutes while we picked up our groceries. We would do that for weeks, for months, for years. That's the condition my clients are in, and that's not something we can tolerate. Even in the prison context, I'm not aware of other requirements like this in other prisons either. This seems to be even unique within the prison context to have this kind of order. Well, there are other prisons that have imposed such a mandate by themselves, and that's in the record here. But I don't think it really changes the analysis. This court in Edmode made very clear that the Eighth Amendment analysis is entirely fact-specific and driven by the conditions at a particular prison. Let's talk about the facts then. Does the record tell us anything about how much more effective, how many fewer COVID infections among the prisoners, how many fewer COVID deaths among the prisoners would there be with a vaccine mandate for staff as opposed to the mitigation measures that are currently in place? It doesn't. It doesn't because it can't. What the record does show is the top doctor and the receiver in charge of running our medical care system have said this can't continue. Our medical care system has been disrupted to such a severe degree that we are at risk of harm. Well, what's the basis for them saying that? Let's say that if somebody were to run an analysis and having a vaccine mandate would have a marginal difference of one COVID infection. Would it then violate the Eighth Amendment for the California state prison system not to have a vaccine mandate? No, but I don't think you can reduce it to that sort of level of simplicity here. Well, the fact that your answer is no, doesn't that mean that we have to quantify it somehow? Because you're admitting, as you have to, of course, that there can be a difference so small in terms of effectiveness that there wouldn't be an Eighth Amendment violation if the state didn't have a vaccine mandate. So doesn't that mean that we need to actually have a number somehow? And the Supreme Court has not demanded that. In this case in Plata, it did not require that. What it did look at, and I think it's important to remember, and I think the district court, when it appointed its receiver, described it really well, but prisons are hard. They're complex. It's a polycentric problem, a spider web. All of these things implicate other things, and what we have in the record here is the receiver and the top doctor, the people responsible for the system, saying— Wait a minute. They're responsible for the health care system, and your point is really well taken. It's a lot more than that. It's not just the health care system, and I don't mean to make light of that. This is an enormously complicated job that the receiver has. Absolutely. But there's more to running the prison system, and so I have not been subtle about this point in this argument. How can you help us out with that? There is this implied threat that corrections officers will walk, whether we have fairly described that as a veto or not. I'm concerned about not having a quantification of that number, of the assessment of that risk. The district court thought it was speculative. On the other hand, the secretary has to be concerned with keeping all of the operation running, including safety and security of the prisons. What do we do with that? I agree entirely, and I don't think this court has to reach that question here. Why? Because the state did not raise operational concerns before the district court when it was considering whether to order that the receiver's recommendation be implemented. The first time that they brought any evidence in the declaration that you're speaking of, the 700 who are over 50 and are eligible to retire, that only came in on their motion to stay on October 25th, a month after the district court issued its order. The district court made very clear before it issued the order on the receiver's recommendation that it wanted to hear all evidence and argument that would hold an evidentiary hearing if necessary, and the state did not raise any of these issues. So should we remand for findings of fact on that point? Because after all, counsel, I know you can relax. I'm going to give you some extra time because we've taken a lot of your time, but this is a really important point, at least on my end. I'm just one of three, as you can see. But this is very important to me, and I don't think we have much about this at all. And we have been, again, to paraphrase, sort of beaten about the head and shoulders for decades. We understand clearly from the powers that be that we are not to meddle in running prisons. We're just judges. We don't know about running prisons. So there's this other imperative that, for me, is like you're asking me to overlook this 800-pound gorilla. If I'm concerned, and I clearly am, that this other part of running the prison system and this concern about early retirement is absent and wasn't raised before the district court, should we remand? This court should affirm, based on its standard reviews, if any party thinks that the court's order should be modified based on evidence that was not and could not have been brought before it previously, they're welcome to seek modification. The Supreme Court in Plata made very clear that at any time, when you have these sorts of orders, parties can come and seek modification. We also don't want to say. That would take only how many months to get to us on an emergency basis, even? And in the meantime, we have to be concerned about if this was implemented immediately, as counsel have indicated, and I have, again, not been subtle about it. Was there any thought about phasing it in so that this risk could be teased out? But you're suggesting we should just pull the trigger. I think you should remand, but the question of implementation was always left by the district court to the state and the receiver, and I think a lot of your concerns could be addressed there. You know, I don't think the record is. So forgive me for interrupting, but when you say remand, then maybe I'm misunderstanding. You would have us remand for implementation or for the district court's order is a firm deadline. It says by this date, and it's now January. But it was a one-shot deal. That's right. There's two orders. The first one, finding the eighth amendment violation, I think you can affirm. The second one, it's going to have to reconsider it anyway. As you note, the implementation deadline has long passed, and I think the parties and the receiver can look together and see if there's a different implementation plan that's appropriate now, and that would prevent us from being back up here in six months and still no protections for my clients. I appreciate the clarification. I've taken a lot of your time. Do you have additional questions? No. Thank you. Thank you for keeping track. Go right ahead. Thank you. I would like to focus this court once more on the eighth amendment standard, and again, as this court has acknowledged, that standard is reasonableness, and it is a very high burden for my friends on the other side to show deliberate indifference. The state acted proactively to implement vaccine programs for inmates and to implement vaccination programs for staff, and these programs for staff are above and beyond what the state requires, for example, many state workers in terms of prison staff being tested twice per week, in terms of having a targeted mandate in prison medical settings, and in terms of the myriad of other measures that the state has implemented. And I'd point to a couple of statistics showing that the state's measures worked. For the six months preceding the district court's order, case rates in California prisons were actually at or below case rates across California, and that's reflected in the briefing and in the California Department of Corrections website. I agree, and your briefing tells us that. But what about this notion that there is a difference because these folks in prison aren't choosing to subject themselves to this exposure? It's a very uniquely vulnerable population. So what do we do about that? I would point this court to the decision in Hines v. Youssef, and in Hines this court acknowledged that difficulty, where the fact that prisons are built in an area endemic for valley fever, they cannot necessarily choose to live in that area. And yet still this court found that the fact that the free population,  and that the level of risk was similar to a level that we as a society in that area generally accepted, found that that was directly relevant to the objective Eighth Amendment question, and it led this court to conclude that that was in the qualified immunity context, but there was essentially a discussion of the fact that that was relevant to the objective standard and that this level of risk was one we were willing to accept. Can I ask, is the vaccination of non-medical staff within the scope of the receiver's duties here under the order appointing him? The receiver has not made the claim that he would have the authority to issue that type of binding order, and in Hines this court actually distinguished between binding orders and the receiver's recommendations and found that a decision not to follow a recommendation was not a clearly established Eighth Amendment violation. So there is a significant difference there, and I don't believe that the receiver could make the conclusion that they can issue that type of binding order given the fact that this would affect prison staff. I don't think you're purported to. I think the order or the recommendation was in response to the court's request about what needs to be done. Again, the record screams out at me that there's a lot of really diligent, hardworking people trying to figure this out all the way across the board, by the way, including all of you, which I appreciate very much. But it is an airborne virus, right? So that seems to be endemic in the nature of the virus. Yes, Your Honor, and that is why the state has taken the steps that it has. And even at the time of the district court's order, the state had implemented a medical mandate shortly before that order. That mandate had not – there was no implementation deadline yet, or that deadline had not yet passed. We know that vaccination rates were increasing and continue to increase. And again, with Omicron, as this court pointed out, there's no way to quantify how much more effective a universal mandate would be, particularly when we know how infectious Omicron is and has been, and the fact that there are so many other steps that the state has taken thus far. I do think that's a real weakness in the argument of my friends on the other side. And there is a level at which a minimal change in effectiveness is relevant to the Eighth Amendment question. And that's far more relevant to the Eighth Amendment reasonableness standard. The effectiveness of the state's measures is far more relevant than the operational concerns that were discussed. We're really looking at what the state has done, the reasonableness of those measures, and the amount that the state has reduced the risk. Let me ask you the same question I ask the folks on the other side. How much more – how effective is what the state's doing right now compared to how effective it would be to have a vaccine mandate? The single most important thing that the state could do is offer vaccines to inmates, and the state has done that. Certainly this would present a different question if the state had not done that. There is firm evidence in the record about the effectiveness of vaccines, and we know how much vaccination of inmates had a role in lowering case rates across the prisons. I think there was something in the record about masking requirements are being complied with. Why won't the state enforce the masking requirements in prison for its staff? The state does enforce those requirements, and I would note, too, that the district court's order is not based on data. Well, I thought the receiver said that the masking requirements were not being complied with. That's not – That the enforcement was inconsistent. There's evidence in the further excerpts, for example, that some of the information about noncompliance was actually taken from staff who were not reporting to work or who did not need to report to work on a certain day. For example, with respect to testing compliance, that's in the further excerpts at page 23. They were working on a system for monitoring compliance, but there's no evidence of widespread noncompliance. I don't believe that's the case. Sorry, you don't believe what is the case? That there's evidence of widespread noncompliance been pointed out specifically, but more broadly, that's not the basis of the district court's conclusion. The district court's conclusion was based on an analysis of the state's policies, and that is what we're asking this court to find was erroneous and should be overturned. Unless this court has any further questions, I see I am over time. Did you get your questions answered? Yes, I did. Thank you. All right, I think then we all did. Thank you, Your Honor. This court should vacate the injunction. Thank you. Has everyone used all their time? Okay, just checking. Good. Thank you all so very much for your excellent briefing, truly excellent briefing and arguments. It's very, very helpful. We'll take this case under advisement. You can stand and recess for the day. All rise. This court for this session stands adjourned.
judges: CHRISTEN, BRESS, Feinerman